# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ELIO MONTENEGRO, | |
| Plaintiff, | Case No. |
| v. | |
| ROSELAND COMMUNITY HOSPITAL ASSOCIATION, | **JURY TRIAL DEMANDED** |
| Defendant. | |

## COMPLAINT

Plaintiff Elio Montenegro, through his undersigned counsel, brings this action against Roseland Community Hospital Association ("Roseland") and alleges as follows:

## NATURE OF THE CASE

1. This lawsuit concerns an extraordinary and ham-handed campaign by Roseland, including through Chief Executive Officer, Timothy Egan, to retaliate against Elio Montenegro for filing a whistleblower complaint under the United States False Claims Act (31 U.S.C. §3729), the Illinois False Claims Act (740 ILCS 175/3), and the Illinois Insurance Claims Fraud Prevention Act (740 ILCS 92/1). At the time he filed his whistleblower complaint, Montenegro was a senior executive at Roseland and had learned that Roseland was engaged in fraudulent billing practices related to COVID-19 testing. This included billing Medicare, Medicaid and private insurers for doctor visits that never happened and full blood panels that tested for unrelated conditions whenever patients asked for a simple test to identify active COVID infections (the well-known PCR nasal swab test). Montenegro went to Egan and Roseland's Chief Financial Officer, Robert Vais, to inform them of this fraudulent practice, but they sent him away, telling him the fraudulent billing would continue for a simple reason: it was profitable to Roseland.

2. On May 11, 2021, Montenegro filed his *qui tam* complaint in this Court on behalf of the United States and the State of Illinois (the "*Qui Tam* Complaint"). The *Qui Tam* Complaint was filed against Roseland; the company that runs Roseland's in-house medical testing lab, American Medical Labs ("AML"); Roseland's former Medical Director for its COVID-19 testing program, Dr. Terrence Applewhite; and the company through which Applewhite practices and bills third-party payors, Five Apples Inpatient Services, LLC ("Five Apples"). As the law requires, the *Qui Tam* Complaint was filed under seal.

3. On December 1, 2022, the Court unsealed the *Qui Tam* Complaint, a copy of which is attached here as Exhibit 1. Roseland's campaign of retaliation against Montenegro began the next day, on December 2, when Egan – Roseland's CEO – sent Montenegro an ominous text that included only a picture of the first page of the complaint. Though it included no other words, the message was clear: Egan knew about the *Qui Tam* Complaint, knew Montenegro was the relator, and Egan was not happy Montenegro had revealed Roseland's fraudulent scheme.

4. There was nothing subtle about the subsequent four months of isolation and harassment that Montenegro endured. He was told meetings that were necessary for him to do his job had been cancelled, only to find out later that the meetings had occurred as scheduled but without him. He was locked out of other meetings. Security cameras were installed around his desk. His subordinates were told to report around him and not to him. Colleagues deflected discussion with Montenegro about projects that he had been charged with directing. At one point, he was told that he had been relieved of all responsibility for a safety drill that he had previously overseen. Then, despite his being locked out of the drill, Egan blamed him for the drill's defects. Egan disparaged Montenegro to others at the hospital, saying Montenegro only blew the whistle on the hospital's fraud scheme because he was in search of a "payday." Finally, having failed to

drive Montenegro to quit through this pattern of demeaning and childish treatment, Egan fired Montenegro.

5. The United States and Illinois False Claims Acts both prohibit exactly the sort of retaliation against whistleblowers in which Roseland and Egan have indulged. The laws do so to encourage individuals like Montenegro, who learn of a fraud on the public fisc, to come forward when they see evidence that greedy actors are putting profit above honesty in making false claims for public payments. Unfortunately, just as the False Claims Acts did not deter Roseland and Egan from adopting a policy of false and fraudulent billing in the first place, the law did not deter them from retaliating against Montenegro for his lawsuit seeking to expose their misconduct and make whole the federal, state and insurer payors who were the scheme's victims. Montenegro hereby sues for his own damages incurred as a result of Roseland's campaign of retaliation against him.

## THE PARTIES

6. Plaintiff Elio Montenegro is a citizen and resident of the State of Illinois. He has worked in the healthcare field for over 25 years, most recently at Roseland Community Hospital as Senior Director of Grants Services and coordinator for COVID-19 testing, until his discharge on March 31, 2023.

7. Defendant Roseland Community Hospital Association is an Illinois not-for-profit corporation with its principal place of business located at 45 W. 111th Street in Chicago, Illinois.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §3730. This Court has supplemental jurisdiction over the Illinois state whistleblower claim pursuant to 28 U.S.C. §1367.

9. This court has personal jurisdiction over the defendant pursuant to 31 U.S.C. §3732(a) because the defendant's principal place of business is in this judicial district and the defendant transacts business in this district.

10. Venue is proper in the Northern District of Illinois pursuant to 31 U.S.C. §3732(a) because, at all times relevant to this Complaint, the defendant conducted business in this judicial district and because the statutory violations alleged occurred in this district.

**FACTUAL ALLEGATIONS**

**I.  Montenegro's Employment with Roseland**

11. In the Spring of 2020, Montenegro was working as Roseland's Senior Director of Development and its COVID-19 testing coordinator. Montenegro had at that time and until his termination, been a member of Roseland's senior management team. His performance reviews were consistently positive and raised no issues whatsoever concerning the skill and integrity with which he did his job, which over time included oversight of grant applications and supervision, marketing and media relations for major projects for the hospital.

**II.  Roseland's Scheme to Defraud the Federal and State Government and Private Insurers**

12. On March 18, 2020, as the United States and the world faced the COVID-19 Pandemic, Congress passed the Family First Coronavirus Response Act ("FFCRA"), which mandated that Medicare, Medicaid, and private insurance plans cover COVID-19 diagnostic testing and administration costs without cost-sharing. Then on March 27, 2020, Congress passed the CARES Act, which amended the FFCRA to include a broader range of diagnostic items and services that plans and insurers must cover without any cost-sharing requirements, prior authorization, or other medical management requirements.

13. These acts made it much easier for healthcare providers like Roseland to be

reimbursed for COVID-19 testing, for which there was at the time near-panicked need for access.

14. Two different types of COVID-19 tests arose at that time. The first was the polymerase chain reaction ("PCR") test, performed by taking a nasal or saliva swab. The PCR test detects the presence of the virus if the patient is infected with COVID-19 at the time of the test. The second type of test was a serology (or antibody) test, which looks for antibodies in blood drawn from the patient to determine whether that patient had a past COVID-19 infection.

15. The Centers for Medicare and Medicaid Services (CMS) determined that both PCR and serology tests qualified for reimbursement. However, the basic requirement of medical necessity still applied to all COVID-19 testing.

16. Health care providers submit claims to Medicare, Medicaid, and private insurers using CMS Form 1500, which requires the provider to certify that the service provided was medically necessary and personally performed by the health care provider as a condition of paying the claim. A determination of medical necessity requires that the healthcare provider conduct an individualized evaluation of each patient and make a determination about what tests or services, if any, are medically appropriate in accordance with accepted standards of current medical practice.

17. The determination of medical necessity involves an assessment of the clinical condition, diagnosis, history, and other clinical indications individual to each patient.

18. In February of 2020, Roseland geared up to perform COVID-19 testing in response to the increase in COVID-19 infections and named Dr. Terrence Applewhite ("Applewhite") as the Medical Director of its COVID-19 Initiative. Roseland's COVID-19 Initiative included a drive-thru testing system and on-site testing and analysis of the samples through American Medical Lab ("AML").

19. At that time, there was a high demand to identify active COVID-19 infections to

contact trace and quarantine infected patients, which was the purpose of the PCR test. However, Roseland soon realized that it could bill patients for both a PCR test and a serology test regardless of medical necessity.

20. On March 31, 2020, Roseland developed a written COVID-19 testing policy whereby the determination of whether to perform a PCR or serology test was ostensibly left up to the patient without a physician's determination of medical necessity. The policy encouraged patients to opt for the unnecessary serology tests by emphasizing that the serology test results would be provided within 24 hours, whereas the PCR test results would take 3-7 days. Roseland never told patients that the serology test was medically unnecessary or that it could not detect an active COVID-19 infection. As a result of this misleading information, upwards of 95% of Roseland's patients opted for an unnecessary serology test in conjunction with the PCR test.

21. Roseland needed a physician's order to bill Medicare and Medicaid for the PCR and serology testing, which required an individualized assessment of each patient and a plan of care that included medically necessary testing. However, no Roseland doctor made an independent determination of medical necessity for either type of COVID-19 test. Rather, Dr. Applewhite wrote a single prescription that was photocopied tens of thousands of times and used by Roseland for different patients whose tests were then submitted for reimbursement.

22. This resulted in massive amounts of unnecessary testing and overbilling to Medicare, Medicaid, and private insurers in order to obtain larger reimbursements and greater profits for Roseland.

23. Roseland's claims for reimbursement required Roseland to certify to the payors that each test was medically necessary as a condition of payment. However, no doctor had examined any of the patients tested and therefore no doctor made a determination of medical necessity.

24. Approximately three months into the Pandemic, Roseland expanded the scope of its fraud by using the blood drawn for the serology tests to conduct testing for additional, unnecessary conditions that were not indicated at the time of testing.

25. Roseland tested the serology samples for chlamydia pneumoniae, Mycoplasma pneumoniae, and Bordetella (all bacterial infections), in addition to other viruses. No physician had determined that these "full panel" blood tests were medically necessary, yet Roseland performed them on all blood samples that were taken for the serology tests.

26. Roseland then billed Medicare, Medicaid, and private insurers for those tests through a third party known as "Change Healthcare."

### III. Montenegro Discovers Roseland's Fraud

27. Montenegro discovered that these additional and unnecessary tests were being performed with patients' blood samples when he received an explanation of benefits (EOB) for his own child, who went to Roseland to be tested for active COVID-19 infection but then was given both a PCR and serology test. The resulting EOB displayed $2,986 in submitted charges, which included not only the unnecessary serology test but also a full blood panel for unrelated conditions not indicated whatsoever and for which no testing was requested.

28. Montenegro went to CEO Egan and CFO Vais, with whom he worked, to express his concerns about this unnecessary testing and billing. But both were already aware of this practice and told Montenegro that the unnecessary tests were being performed and billed to payors in order to increase Roseland's reimbursements and profits.

29. Montenegro also discovered that Dr. Applewhite was billing for patient visits that he never performed through his medical practice, Five Apples Inpatient Services, LLC ("Five Apples").

30. Montenegro discovered this when he received an EOB for another family member for COVID-19 testing that billed for a patient visit with Applewhite though Montenegro knew that Applewhite had not seen the family member or been involved in the testing process.

31. Montenegro informed Roseland CEO Egan that Applewhite was falsely billing for patient visits that he never conducted on or about September 20, 2020. However, Roseland did not terminate Applewhite until January 21, 2021 and never reported the false billing for thousands of patient visits that Applewhite never performed.

32. Insured Roseland patients began receiving EOBs and/or bills that showed amounts owed for the additional and unnecessary testing. Concerned that these patients might complain to the government and insurers about the unnecessary testing, Roseland and AML covered up their fraud by sending letters to the patients on Change Healthcare letterhead stating that the bills were in error and that no money was due for their co-payment.

33. Roseland never withdrew these false claims it made to the government and other private payors.

34. Montenegro realized that Roseland was intentionally submitting claims for payment that were falsely certified as medically necessary and that Roseland would not end this practice even after he brought it to the attention of Egan and Vais, Roseland's CEO and CFO, respectively, because they told him the conduct was intentional and profit-driven.

**IV. Montenegro Files his *Qui Tam* Complaint Under the False Claims Act**

35. On May 11, 2021, Plaintiff filed a complaint on behalf of the United States Government and the State of Illinois as a *qui tam* relator against Roseland, AML, Applewhite, and Five Apples in the U.S. District Court for the Northern District of Illinois. *See* Exhibit 1.

36. The complaint alleged violations of the Federal False Claims Act (31 U.S.C.

§3729), the Illinois False Claims Act (740 ILCS 175/3), and the Illinois Insurance Claims Fraud Prevention Act (740 ILCS 92/1) and was initially filed under seal. The United States and State of Illinois declined to intervene in the case and the complaint was unsealed on Thursday, December 1, 2022.

    **V.    Roseland's Retaliation Campaign Begins The Day After the *Qui Tam* Complaint is Unsealed**

37. On Friday, December 2, 2022, the day after the *Qui Tam* Complaint was unsealed, Roseland CEO Egan sent Montenegro a text message at 7:15 pm. The ominous text consisted only of a picture of the first page of the *Qui Tam* Complaint. While Egan wrote no words, his message was very clear: he knew Montenegro was a relator and he was not pleased.

38. The next working day, Monday, December 5, 2022, Montenegro received an email from Egan informing him that Montenegro's daily 10:00 am meeting with local federally-qualified health centers (FQHCs) was canceled. This was a standing meeting that was part of a grant (the "Transformation Grant") whose application Montenegro supported as part of his job responsibilities.

39. Also on December 5, Montenegro received another email from Egan stating that Montenegro's standing 2:00 pm meeting with the Illinois Department of Health and Family Services was canceled. This was another daily meeting that was a regular part of Montenegro fulfilling his responsibilities at Roseland.

40. In fact, neither meeting that was the subject of Egan's December 5 emails to Montenegro was canceled and Egan had lied to Montenegro in his first act of retaliation against him. Montenegro learned this about the Department of Health and Family services meeting when he joined that meeting via WebEx without audio or video at 2:00 pm and the meeting was being conducted as scheduled. All of usual participants—including Montenegro's direct report, Tony

9

Garritano—were in attendance. Montenegro reached out to Garritano about these meetings and Garritano told him that there had been no change to either.

41. Egan further caused other messages to be sent to Montenegro on December 5 stating yet other weekly meetings of Roseland's senior management team, of which Montenegro was a part, had been canceled. This was also untrue.

42. On December 8, Doctor A (a participant in Montenegro's team working on the Transformation Grant), called Montenegro to say that Tim Egan had requested a meeting with him. During that meeting, Egan disparaged Montenegro for filing the *Qui Tam* Complaint, telling Doctor A that Montenegro was just looking for a "payday."

43. On December 9, Nina Burnett, one of Montenegro's reports, told him that other hospital employees, Brendon Troutman and Garritano, had reached out to her and another Roseland employee, Somika Dixon, for help with the Transformation Grant. As noted, that project was Montenegro's responsibility but his direct reports were being told to work around him. Burnett was also told that she would be required to sign a non-disclosure agreement, apparently in response to Montenegro having filed the *Qui Tam* Complaint.

44. That same day, December 9, Montenegro learned he was being omitted from emails to his direct reports regarding the Transformation Grant. He also realized that his normally pleasant and professional interactions with CFO Vais and Human Resources Director Nikia McGee/Glenn had chilled. Vais shooed Montenegro away from his office when Montenegro attempted to discuss hospital business with him. McGee/Glenn indicated that she did not want to engage with him when he tried to discuss hospital business with her.

45. On December 12, Montenegro overheard Garritano discussing the Transformation Grant with Brendon Troutman, the Director of Outpatient Services, specifically about getting

collaborating agencies to participate. That was Montenegro's responsibility.

46. Further, on December 12, Egan emailed Montenegro and directed him to attend the standing meeting with the Illinois Department of Health and Family Services. This was the meeting that Montenegro had falsely been told was canceled the prior week. But this time, Egan informed Montenegro too late for him to join the meeting as the meeting had already started and the Illinois Department of Health and Family Services did not admit participants after the meeting commenced. Montenegro was thus not admitted to the on-line meeting.

47. On December 14, Montenegro was informed that the Director of the Behavioral Health Unit ("BHU"), Jackie Winn-Toney, would be taking over and working with him in the Medical Stabilization Unit, despite the fact that Montenegro was significantly senior to Winn-Toney and had served as co-administrator over the BHU.

48. On December 15, ProPublica and WTTW Channel 11 published a story about Egan's political activities and hospital business awarded to Egan's friends. Montenegro's *Qui Tam* Complaint was mentioned in the article.

49. The day of the ProPublica report, when Montenegro arrived at his office, six new security cameras had been installed in his department office, a space of approximately 1,600 square feet. HR Director McGee/Glenn requested installation of the cameras due to the "perception that things were being removed from staff desks and some other unidentified security concerns." No other director on Montenegro's floor had security cameras looking at his or her workspace.

50. On December 16th, Montenegro's direct report Nina Burnett, informed him that HR Director McGee/Glenn instructed her to report any personnel issues to the Chief Nursing Officer, bypassing Montenegro, to whom such issues would normally be raised as he was her supervisor.

51. By December 16, Montenegro realized that he was no longer receiving any of the emails from the rest of the Roseland senior team, as necessary to do his job. He had been removed from all of the email distribution lists and text threads he had been on previously in order to do his work.

52. On December 19, Montenegro was assigned Administrator on Call ("AOC") duty by Chief Quality Officer Sharon Davita, despite the fact that he had previously been approved for paid time off ("PTO") during the period assigned. Montenegro told Davita that he would be on PTO during that assignment, but said that he would cover the AOC duty because he would still be in the area. During that AOC week, Plaintiff never received any calls from anyone escalating an issue to the AOC level. However, on the following Monday and again on Tuesday, Plaintiff received emails from Davita castigating him for neglect of his AOC duties.

53. By December 27, less than four weeks after the *Qui Tam* Complaint had been unsealed, Montenegro had been completely isolated from his colleagues and effectively stripped of his duties. He was removed from email and text threads for directors, managers, and senior leaders. He was excluded from senior management meetings, which he was falsely told were canceled and not rescheduled. Other directors and managers ceased discussing work-related strategies and concerns with Montenegro, which was part of his job. When Montenegro asked colleagues about specific projects on which he was responsible, they would demure and tell him that there was "nothing new."

54. On December 29, CEO Egan sent an email to Montenegro with the subject line "Final Warning – Cease and Desist." Egan baselessly accused Montenegro in that email of "engaging in unprofessional activities that could potentially foster a negative work environment." No examples were given. Egan told Montenegro this would be noted in his employment and

personnel file, "similar to your prior work violations."

55. On December 31, 2022, after receiving Egan's December 29, 2022, email – and because there were no such "prior work violations" – Montenegro responded in writing to Egan. Montenegro stated that he was aware his personnel record consisted of positive reviews, including accolades from board members. He further asked Egan to stop the campaign of harassment that had begun with the unsealing of the *Qui Tam* Complaint and reminded Egan that retaliation like the discriminatory conduct Montenegro had experienced since the unsealing of the complaint was unlawful under the False Claims Act.

56. Specifically, in his December 31, 2022, email to Egan, Montenegro wrote as follows:

> Hi Tim,
>
> By way of clarification, I did not approach any Roseland Hospital employee in order to share any article. Rather, this employee simply asked me to forward them an article, which I did.
>
> However, in your email, you make refence to my alleged "prior work violations." As you know, Roseland Community Hospital records will reveal that I have received nothing other than positive reviews – including accolades from Board members, during the past three years. I have and continue to maintain an impeccable employment record and expect that will continue.
>
> In your email, you state that I am not entitled to harass and seek to engage Hospital employees and representatives about my "frivolous lawsuit." This comment, as well as your prior cryptic message to me in which you forwarded to me my False Claims Act complaint but did not include any text, and your prior exclusion of me from meetings squarely within my job description, are nothing other than a continuation of the discriminatory conduct I have been subjected to since the lawsuit was unsealed.
>
> Although I have mentioned this before, I am sure counsel for the hospital would tell you, retaliation of any kind against a False Claims Act relator like me is unlawful. Specifically, the law prohibits discharge, demotion, suspension, threats, harassment, or any manner of discrimination in the terms and conditions of employment that is based on actions in furtherance of a False Claim Act case.

13

I am asking that you please stop your conduct.

Elio

Elio Montenegro
Administration

57. Despite Montenegro's request of Egan to stop the retaliation, the retaliation continued.

58. As of January 9, 2023, Montenegro was removed from all hospital director distribution lists and only received emails with general announcements. On that same day, Montenegro realized that he did not have access to the NRC Health website that included reports necessary him to do his job, known as the "HCAPHS Stoplight Report."

59. On January 10, Montenegro was excluded from an announcement regarding personnel and organizational changes within the Medical Stabilization Unit, which had previously been under his management.

60. On January 12, Montenegro learned that Egan had removed him from all grants-related discussions, which as the senior development officer at the hospital was Montenegro's core job function.

61. On January 13, Montenegro learned that Burnett, who previously had reported to him, was reporting to Winn-Toney. Montenegro sent an email to HR Director McGee/Glenn on January 17, asking for clarification regarding Burnett's move but received no response. On January 23, Burnett called Montenegro and informed him that she was told no longer to report to him but would thereafter report to another manager.

62. Also on January 23, Operations Director Essix White and HR Director McGee/Glenn announced during a daily 9:00 am virtual meeting that all future meetings were canceled and that a new calendar invitation would be sent out to those who needed to participate.

Montenegro was never invited to future meetings after that date.

63. Montenegro received another email on January 23 stating that all future senior team meetings had been canceled, but received no new calendar invitation to future meetings, despite being a member of the senior team.

64. Further demonstrating Roseland's determination to prevent Montenegro from doing his job in the aftermath of the unsealing of the *Qui Tam* Complaint, on January 24, CFO Vais entered Montenegro's workspace but ignored Montenegro and spoke directly to his direct report, Garritano, about grant audits and finance matters that were Montenegro's responsibility. Vais did not address and deliberately excluded Montenegro from that discussion.

65. On January 27, the Chief Nursing Officer told Montenegro that the 9:00 am daily virtual census meetings were canceled because CEO Egan did not want Montenegro to be part of those meetings.

66. Also on January 27, Montenegro learned that hospital staff were being interviewed and asked who had given Montenegro access to hospital documents and records he may have referenced to substantiate his False Claims Act case against Roseland.

67. On February 1, Montenegro learned that a new daily 8:30 am census call had been scheduled but that he had been excluded from that call, which had always been part of his job responsibilities.

68. On February 3, the Chief Nursing Officer informed Montenegro that there was a new daily a.m. conference call for all hospital senior leadership, again from which Montenegro had been excluded.

69. By February 22, Dr. Guillermo Font, a physician participating in the Transformation Grant application, was discussing grants directly with CEO Egan. Montenegro

15

was barred entirely from those discussions, which were his core job function.

70. After nearly three months of isolating and demeaning Montenegro as alleged above, Roseland realized that its Egan-led campaign of harassment would not deter Montenegro, cause him to resign, or lead him to withdraw his *Qui Tam* Complaint.

71. Thus, on February 22, Montenegro received an email from the HR Director McGee/Glenn suggesting that he broke the hospital's code of ethics by not responding to an email and could face disciplinary action. Montenegro responded that, in fact, he had instructed one of his reports to respond to the email in question and that a response had been provided. He drew McGee/Gleen's attention to the fact that neither she, CEO Egan, or CFO Vais had been responding to any of Montenegro's email for weeks – since the unsealing of his *Qui Tam* Complaint. McGee/Gleen replied that Montenegro was "acting out" and being unprofessional.

72. On February 24, Montenegro was asked for reports explaining statistics that had come from the finance department, outside of his job description. He had never previously been asked for such information before his *Qui Tam* Complaint had been unsealed. Montenegro did respond but was told his explanation was "insufficient." No additional information was provided.

73. On March 1, Montenegro wrote CEO Egan asking about his exclusion from senior team meetings and expressing concern that he had been stripped of all abilities to perform his job requirements. Egan never responded.

74. On March 20, Montenegro was invited to participate in an active shooter drill. A few minutes later he was told that he was stripped of his duties as Liaison Officer for active shooter drills. Roseland conducted an active shooter drill on March 21st, but Montenegro was not assigned a new role for the drill since being dropped as the Liaison Officer. Nevertheless, CEO Egan called the drill a failure in the post-drill debrief, affirmatively blaming Montenegro, who had been

16

stripped of any role in the drill.

75. Finally, on March 31, 2023, Egan informed Montenegro that he was terminated with immediate effect "for egregious violations of the code of ethics." A follow up letter from McGee/Glenn stated falsely stated that Montenegro "put personal financial gain over your duties as a Senior Director," echoing Egan's statements in the days after the *Qui Tam* Complaint was unsealed denigrating that Montenegro's conduct as relator as nothing more than a search for a "payday." That statement, like the pretext for Montenegro's termination, was untrue. In fact, Montenegro simply sought to undo a fraud against the federal and state governments, as well as private insurers. Ultimately, he was fired in retaliation for doing so.

## COUNT I
### Unlawful Discrimination and Termination Under 31 U.S.C. §3730(h)

76. Montenegro repeats and realleges the foregoing paragraphs 1 through 75 as though fully set forth herein.

77. At all times relevant to this complaint, Montenegro was engaged in activities protected by the False Claims Act, 31 U.S.C. §§3729-30. Specifically, Montenegro was learning facts about Roseland's fraud against the U.S. Government, the State of Illinois, and private insurers, and then engaging in protected activity by filing the *Qui Tam* Complaint as a relator.

78. The Act makes it unlawful for Roseland to threaten, harass, terminate, or otherwise discriminate against Plaintiff for uncovering and reporting its fraud and for filing the *Qui Tam* Complaint.

79. Once the *Qui Tam* Complaint was unsealed, Roseland had actual knowledge of his efforts to investigate and report Roseland's fraud upon Medicare, Medicaid, and private insurers and of his status as a relator.

80. Roseland's harassment, intimidation, and isolation of Montenegro began

17

immediately after the unsealing of the complaint and was relentless thereafter until his termination.

81. Roseland initiated a concerted campaign of harassment and intimidation by ostracizing Montenegro completely from his colleagues, excluding him from all meetings, removing his direct reports from his charge, and installing security cameras in his workspace.

82. As part of its retaliatory campaign of harassment, Roseland made it impossible for Montenegro to complete his job duties.

83. When Montenegro remained undeterred by Roseland's intimidation tactics, the hospital made up pretextual reasons to dismiss him and fired him without actual reason or cause and with the real intent to punish Montenegro for filing the *Qui Tam* Complaint.

84. Roseland's CEO baselessly accused Plaintiff of "prior work violations" when Plaintiff's employment file contained only positive reviews and accolades.

85. Roseland's discharge of Montenegro was motivated by a desire to retaliate against Montenegro's exposure of their fraud.

86. Roseland's pattern of discrimination and harassment against Montenegro, as alleged herein, demonstrates a causal relationship between his reporting of the hospital's fraud and his termination.

**WHEREFORE**, Montenegro respectfully requests judgment against Roseland for relief from its retaliatory activities, including reinstatement with his same seniority status, two times the amount of his backpay, interest on his backpay, compensation for special damages to include costs of this litigation and his attorney fees, and for such other relief as this Court deems fair and just.

## COUNT II
## Unlawful Discrimination and Termination Under 740 ILCS 175/4(g)

87. Plaintiff repeats and realleges the foregoing paragraphs 1 through 75 as though fully set forth herein.

88. The Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/4(g) (IWRPA) provides relief for *qui tam* relators who are discriminated against for bringing lawsuits under the Act against their employers who have submitted false claims for payment by the State of Illinois.

89. At all times relevant to this complaint, Plaintiff was engaged in activities protected by the Act, specifically uncovering and reporting Roseland's fraud and filing the *Qui Tam* Complaint.

90. Once Plaintiff's lawsuit against Roseland was unsealed by this Court, Roseland had actual knowledge of Plaintiff's IWRPA Complaint.

91. Roseland, acting through Egan and others, then enacted a concerted effort to threaten, harass, and discriminate against Montenegro in retaliation for his efforts to halt their fraud upon the state and private insurers.

92. Roseland's discharge of Montenegro was motivated by a desire to retaliate against Montenegro's exposure of their fraud.

93. Roseland's pattern of discrimination and harassment against Montenegro, as alleged herein, demonstrates a causal relationship between his reporting of the hospital's fraud and his termination.

**WHEREFORE**, Montenegro respectfully requests judgment against Roseland for relief from its retaliatory activities, including reinstatement with his same seniority status, two times the

amount of his backpay, interest on his backpay, compensation for special damages to include costs of this litigation and his attorney fees, and for such other relief as this Court deems fair and just.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury.

Respectfully Submitted,

**Elio Montenegro**

By: __/s/ Robert M. Andalman___
     One of his attorneys

Robert M. Andalman (Atty. No. 6209454)
Rachael Blackburn (Atty. No. 6277142)
William Norman (Atty. No. 6335298)
A&G Law LLC
542 S. Dearborn Street, 10th Floor
Chicago, IL 60605
(312) 341-3900
randalman@aandglaw.com
rblackburn@aandglaw.com
wnorman@aandglaw.com

Ricardo Meza (Atty. No. 6202784)
Meza Law
542 South Dearborn Street, 10th Floor
Chicago, IL 60605
(312) 802-0336
rmeza@meza.law